[Civ. No. 3567. Fourth Dist. Mar. 22, 1948.]

B. L. LUNSFORD, Respondent, v. STANDARD OIL COMPANY OF CALIFORNIA (a Corporation) et al., Appellants.

Borton, Petrini, Conron & Borton, Harvey, Johnston, Baker & Palmer and Pillsbury, Madison & Sutro for Appellants.

West, Vizzard & Howden for Respondent.

BARNARD, P. J.—This is an action for damages for the loss of a tank truck and trailer, which was destroyed by fire about four a. m. on August 21, 1945.

The Shell Oil Company maintained a crude oil pump station near Wasco, consisting of a small building with a boiler room to the east, an engine room to the west, and a small office near the center of its north side. This office had an outside door to the north and also doors opening into the boiler room and engine room. The engine room had doors on its north and south sides. The boiler room had doors on its north and south sides and also two doors on its east side. Two of its doors, the one on the north and one of those on the east were near the northeast corner of the building. One function of the boiler room was to heat crude oil so that it could be conveniently loaded. Some 400 feet southerly from

this building were two storage tanks. Underground pipes supplied oil to these tanks and fed oil by gravity to a loading outlet situated 83 feet northeasterly from the northeast corner of the boiler room and 93 feet from the nearest boiler. This loading outlet was separated from the pump station grounds by a wire fence. The loading outlet was raised and oil was loaded in tank trucks by inserting a spout or funnel into the dome of the tank, attaching it to the loading outlet and turning on valves.

This loading and heating arrangement conformed to general custom and had been used for several years. The spouts or funnels, above referred to, were furnished by parties who hauled the oil and the length of spout needed depended upon the different trucks being used. There is evidence that the spout should reach to within a few inches of the bottom of the tank as otherwise the falling oil agitates the oil in the tank and causes more fumes to rise. Some years before, the Standard Oil Company had obtained from Shell the right to use one of these storage tanks with this loading outlet. Under a contract with Standard, Oilfields Trucking Company had charge of hauling this oil for Standard and furnished the spout or funnel which was here used. Oilfields Trucking Company employed the plaintiff Lunsford to do some of this hauling and Lunsford employed one Shields as driver of the truck in question.

On this night Shields had loaded and hauled three or four loads before the trip on which the fire occurred. He knew that fires were burning in the boiler room and that the doors to the boiler room were open. He testified that the spout he was using only reached a few inches into the dome of the tank and that the oil dropped about 4 feet. On each trip he noticed an unusual quantity of fumes rising from the tank as the oil went in, and these fumes were visible. On the preceding trip the fumes were so strong that he moved to the rear of the top of the tank, while the tank was filling, in order to avoid the smell. On the trip in question he opened the valves to let the oil flow in the tank and after checking various things, including his tires, he sat down in the cab of the truck and proceeded to make out a report form. He knew that it took about 20 minutes to fill the tank and about 10 minutes after he had started the oil flowing the fire occurred. He testified ''I just looked up and the whole country looked like it was on fire, whether I just looked

up or whether there was a noise or what, I don't know."
There is no testimony or direct evidence as to where, when
or how the fire first started. Shields ran when he first saw
the fire and was not injured, but the truck and trailer were
destroyed.

A verdict for $11,000 was returned in favor of the plain-
tiff and the defendants have appealed from the judgment
which followed. The appellants first contend that the evi-
dence is insufficient to support the verdict. It is argued
that the cause of ignition of the vapors is left entirely to
speculation and conjecture; that the excessive vapors here
were not caused by them but were caused by the loading
operations over which the respondent's driver had sole con-
trol; that Shields knew that these fumes were unusual in
quantity; and that the record affirmatively shows that igni-
tion was not caused by the boiler fires since the fireman in
charge of these fires testified that the fire was coming in the
northeast doors of the boiler room when he first saw it.

While the actual cause of ignition of these vapors was
not shown by direct evidence an inference may fairly be
drawn from the evidence as a whole that ignition resulted
from these vapors coming into contact with the boiler fires.
The engine on the truck and its lights were shut off, the
static chain was attached, no flashlight was used, Shields
did not smoke and did not strike a match, and all other pos-
sibilities of a spark or flame were pretty well eliminated.

While Shields recognized that an unusual quantity of
fumes was coming from this tank the amount was no greater
than that on previous loads that night and there is no evi-
dence that he recognized the amount as sufficient to be danger-
ous. There is some evidence justifying an inference of
negligence on the part of defendants Campbell and Mason,
who were in charge of the pump station at the time. Camp-
bell was the fireman and Mason the engineer. They testified
that some 20 or 30 minutes before the fire occurred, and
while another truck was loading at this outlet, they went
out on the north side of the building 6 or 8 feet from the
office door; that they then smelled fumes which were pretty
strong; that they remarked about this to each other; that
"We had never noticed them before being that strong";
that the north and east doors of the boiler room were open
and stayed open; and that they presumed that the fumes
came from the truck which was loading at the time.

Neither of these employees then went into the boiler room and thus could not have observed whether or not these unusual fumes had penetrated there. There is evidence that the operation of the boiler fires had a tendency to suck air in, both from the room and from outside of the room. After noticing these unusual fumes these employees went into the office and remained some 20 or 25 minutes. Campbell testified that he then went into the boiler room and as he entered the room he saw fire coming in the two doors at the northeast corner, that he ran out the south door and into the engine room where he found Mason putting out a fire in his broom. Mason testified that he first saw any fire when he was about in the center of the engine room; that he raised up and saw a flash of flame in the engine room towards the north engine-room door, and a flare "all on the outside"; that it lasted three or four seconds and his broom caught on fire; that the flames he saw were floating in the air; that after the flash disappeared Campbell came in and asked what happened; that they walked to the door and there was then no fire "except on the truck"; that he then moved his car which was parked 60 or 70 feet from the boiler room; that at one time this car was right in the middle of the floating flames; and that there was no fire around the station after the first flash. There was also evidence that about 250 panes of glass in the boiler room which had not been cracked before were cracked after the fire. Shields testified that when he first looked up and saw the fire it was thickest between the boiler room and the truck but there was fire in front of the truck and on the other side too; that it was "pretty thick between the truck and the boiler room" and only in streaks in front of the truck; that it was "solidest" between the truck and the engine room; and that he did not get a very good look at it "because I didn't stay around that long." There was testimony that there was a general custom in this business of closing boiler room doors when fumes were detected near the boilers and of shutting the fires off when gas vapors were detected in close proximity to the boilers.

It appears that Campbell and Mason took no action when they detected unusual fumes a few minutes before the fire, and that they made no investigation to see whether or not these fumes were going into the boiler room although two open doors of the boiler room were closer to the loading outlet than was the point at which they were standing. There is

no evidence as to the atmospheric condition that night except Campbell's testimony that there was "not much" breeze. Campbell and Mason knew, but Shields did not, that fumes from the preceding loading operation had come to within a few feet of the building with its open doors and open flames. Campbell's testimony that when he first observed any fire it was coming through the doors does not demonstrate that the fire originated outside of the building. This does not exclude the possibility that there had been gas fire in the room before Campbell entered it. It would seem reasonable that there must have been some sort of an explosion to crack the windows in the boiler room, this explosion would naturally come at the first ignition of fumes, and the fire coming into the room, observed by Campbell, may well have been other vapors burning which were being sucked into the rooms by the action of the fire under the boilers after the first explosion or ignition occurred. The evidence in its entirety, with the reasonable inferences therefrom, is sufficient to support the implied findings that the fire was caused by these vapors coming in contact with the flames in the boiler room, and that Campbell and Mason were guilty of negligence which permitted this to happen. The question was one of fact and it cannot be held that the evidence is not sufficient to support the verdict.

It is next contended that Shields was guilty of contributory negligence as a matter of law. It is argued that the uncontradicted evidence shows that the excessive vapors here were created by Shields' own loading operations; that knowing that the vapors were excessive he continued his loading operations without shutting off the oil or notifying Campbell or Mason; that he had been instructed by the respondent to stop loading and make a complaint whenever the fumes were excessive or dangerous in his judgment; that he failed to do either of these things; and that he knew all of the conditions and knew that they were dangerous. The respondent testified that he had instructed all his drivers that in the event they found vapors at any time in a quantity which in their judgment was dangerous they should shut off the oil, report the matter and have the condition remedied. While Shields testified that the fumes on this occasion were unusual in quantity he also testified that they had been about the same on his previous trips that evening. There is no evidence that he knew that the quantity of fumes was

sufficient to make them dangerous, and his actions would indicate that he did not so consider them.

While Shields knew that an unusual amount of fumes was coming from his truck it does not appear that he knew that the quantity was dangerous or sufficient to reach the boiler fires 93 feet away. He did not know that fumes from another truck, loaded a few minutes before, had reached at least to within a few feet of the boiler room. There was nothing to indicate to him that conditions were any different from those existing during his loading on previous trips. While it might well have been found, as a fact, that Shields was guilty of contributory negligence it cannot be held that such negligence appears as a matter of law. It cannot be here said that the evidence on this issue is without substantial conflict and that the only reasonable inference which could be drawn from the facts shown points unerringly to contributory negligence on the part of Shields. (*Urbano* v. *Market Street Ry. Co.,* 8 Cal.App.2d 22 [46 P.2d 817].)

 It is next contended that the respondent assumed the risk of losing his truck and trailer by fire since all of the conditions and dangers were known to his employee, who was in sole charge of loading the truck; that the appellants were entitled to have this defense covered by a proper instruction; that they submitted a correct instruction covering this theory; and that the court nullified the entire effect of the offered instruction by adding a sentence thereto. The respondent contends that the defense of assumption of risk was not pleaded. However, the case was tried by the appellants on that theory and an instruction was given, and the essential question here is as to whether prejudicial error may be said to have resulted from the sentence added to that instruction by the court.

The instruction given reads as follows, the last sentence (emphasis ours) being the one added by the court:

"There is a legal principle commonly referred to by the term 'assumption of risk' which now will be explained to you:

"One is said to assume a risk when he freely, voluntarily and knowingly manifests his assent to a dangerous conduct or to the creation or maintenance of a dangerous condition, and voluntarily exposes himself or his property to that danger, or when he knows, or in the exercise of ordinary care would know, that a danger exists in either the conduct or condition of another, or in the condition, use or operation of property, and voluntarily places himself or his property, or remains, or permits his property to remain within the area of danger.

"One who thus assumed a risk is not entitled to recover for damage which resulted from the dangerous condition or conduct to which he thus exposed his property. *One does not however, assume a risk caused by the negligence of another, if there was such negligence by some defendant.*"

It is first argued that there is no basis in the evidence for the added sentence, relating to the possible negligence of another which would not be assumed, because there were here no hidden dangers or hazards which were not obvious to respondent and his driver, and that such an element could have no place here where the driver had complete charge of the loading, and the hazardous condition of vapors was knowingly caused and continued by the driver without any negligent act on the part of any of the appellants. This is sufficiently answered by what has already been said. All of the hidden dangers or hazards were not obvious to the driver, some of the conditions which made the situation hazardous were under the control of the appellants, and there were a number of active or passive acts on the part of the appellants which may have been negligent and which were subsequent to those entering into the conditions knowingly assumed by the respondent or his driver.

It is further argued that the situation here was different from that in the case of *Hedding* v. *Pearson*, 76 Cal.App.2d 481 [173 P.2d 382], where the court said that under the facts there existing any instruction on assumed risk should have included a proviso that "while a person assumed the perils which are naturally incident to the position he has taken, he does not assume dangers which can come only from the negligent acts of another." It is argued that in the instant case the only claim of negligence on the part of appellants is that they did not warn Shields of a dangerous condition of which he was already well aware; that this was a fixed and passive negligence which Shields assumed because he knew all about it; that all cases where assumption of risk has been held inapplicable are cases where knowledge of current conditions was lacking or where the accident was caused by a future active negligence which the plaintiff was not bound to anticipate; that the instruction in question failed to make this distinction; and that it was misleading since the jury may have thought the last sentence related to any passive negligence which had created the original condition containing the risk assumed by the respondent and his driver, and thus the last

sentence nullified and destroyed the effect of the previous part of the instruction.

It is well settled that where this doctrine is applicable the risk assumed is that known to the other party. Appellants' argument here is based on the assumption that any possible negligence on their part was passive, in connection with creating the general condition here, and that all of the conditions were known to and understood by the respondent and his driver. As we have already pointed out, this is not entirely true. If part of their acts were passive and known to the respondent, such as the open doors and the nearness of the boiler room to the loading outlet, another part was more active and not known to the respondent. This includes the failure, with knowledge that vapors had shortly before nearly reached to the building, to ascertain whether they were reaching the boiler room itself, the failure to shut the doors or if necessary to shut off the fires, and the failure to warn Shields of the unusual danger. While this instruction may not be a model in pointing out the difference between any negligent acts in creating the original condition, the risk of which is assumed by the other party who has knowledge of it, and subsequent negligence which is not known to or assumed by the other party, we think the objection raised is more technical than convincing under the facts here appearing. Throughout the evidence the acts relied on as constituting negligence on the part of the appellants were not those in connection with the installation and previous operation of this equipment, or which were known to the respondent, but were acts taking place just before this particular loading commenced and shortly thereafter, and which were not known to the respondent or his driver. The part of the instruction given as requested by the appellants included a reference to the more passive kind of negligence which was involved in the physical conditions as they had existed, and which was known to and assumed by the respondent. The instruction refers to a dangerous condition known to exist when a party knows, or should know, that the danger comes either from the condition or the conduct of another or from the condition, use or operation of property in a manner fully known to him. The instruction then goes on to state that one who thus assumes a risk is not entitled to recover for damage resulting from the dangerous condition or conduct to which he has knowingly exposed his property. The sentence added by the court then follows, stating that

one does not, however, assume a risk caused by the negligence of another if there was such negligence. This indicates, although not as forcibly as might be possible, a distinction between this last sort of negligence which is not assumed and the negligence referred to in the earlier part of the instruction, which is assumed. It would be unreasonable to hold, under the facts of this case, that the jury could have failed to make this distinction or that it may have found for the respondent because of some passive negligence in creating the original setup without finding that any act of negligence had occurred on this occasion in addition to and beyond any that was known to and assumed by the respondent. Under the circumstances here appearing this instruction was not, in our opinion, sufficiently misleading to justify a reversal.

■ Appellants' final contention is that an instruction given by the court outlining the duties owed by the owner or occupant of property to an "invitee" was erroneous and misleading. This instruction is in the usual form and no complaint is made that it does not correctly state the law. It is argued, however, that the instruction was inapplicable here; that the condition of excessive vapors here was known to and caused by the respondent; that the emergency condition arose from the occupancy and control of the respondent and his employer Oilfields Trucking Company and not from any act of any appellant; that any hazardous condition was known to, increased by and continued by the respondent; and that to give an instruction that the appellants owed a duty to the respondent under these circumstances was to mislead the jury into believing that this duty overrode the manifest duty of the respondent to protect his own property by stopping the loading operation which was creating the excessive vapors. This contention is without merit. The instruction merely placed before the jury the general duties of the owner or occupant of these premises upon which the respondent and his driver had been invited. (*Madigan* v. *Hale & Co.*, 90 Cal.App. 151 [265 P. 574].) Other elements were covered in other instructions, all of the instructions are to be taken together as a whole, and there is nothing in this instruction which could lead the jury to believe that it was of controlling importance or that it in any way overrode or did away with other issues otherwise covered and submitted to it.

This is a close case, and while from a factual standpoint it could have been decided the other way the evidence is not

insufficient to support the verdict, and we find no prejudicial error in the instructions.

The judgment is affirmed.

Marks, J., and Griffin, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied May 20, 1948. Schauer, J., voted for a hearing.